IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ROXANNE TORRES,

    Plaintiff,

v.                                                      1:16-cv-01163-LF-KK

JANICE MADRID et al.,

    Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on defendants Janice Madrid and Richard Williamson's Second Renewed Motion for Summary Judgment on the Basis of Qualified Immunity Pursuant to FED. R. CIV. P. 56 and the Court's Order of April 11, 2023. Doc. 150. Plaintiff Roxanne Torres opposes the motion. Doc. 155. The motion was fully briefed on January 16, 2024. *See* Doc. 159. For the following reasons, the Court DENIES defendants' motion.

### I.    Statement of Facts[1]

On Tuesday morning, July 15, 2014, at about 6:30 am, New Mexico State Police officers went to an apartment complex in Albuquerque to execute an arrest warrant on an African-American woman named Kayenta Jackson. *See* UMFs 9, 11; Doc. 1 ¶ 5; Doc. 150-8 (Exh. H,

---

[1] For the Statement of Facts, the Court relies on the Undisputed Material Facts ("UMFs") that plaintiff does not dispute or largely does not dispute. The UMFs are recounted in Document 150 at pages 2 through 7. Plaintiff offers Additional Material Facts ("AMFs") in her response at pages 5 to 7. *See* Doc. 155 at 6–8. The Court cites to supporting evidence as necessary, but it does not cite to all the evidence that supports every fact. Also, although Officers Madrid and Williamson have moved for summary judgment based on qualified immunity, the Court still must view the facts in the light most favorable to Ms. Torres and resolve all factual disputes and reasonable inferences in her favor. *See Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).

0:00–0:15); Doc. 155-2 at 6, 26; Doc. 155-3 at 6.  The officers believed Ms. Jackson was a resident of apartment number 22.  *See* UMF 9; Doc. 1 ¶ 5.  The arrest warrant for Ms. Jackson was for felony white collar crimes.  *See* UMF 10.  Defendants Janice Madrid and Richard Williamson were two of the police officers involved.  *See* UMF 13.

Officers Madrid and Williamson parked their unmarked patrol vehicle near a 2010 black and white Toyota FJ Cruiser.  *See* UMF 13; Doc. 1 ¶ 6.  Plaintiff Roxanne Torres was in the Toyota FJ Cruiser with her motor running.  *See* UMF 8.  She had backed into a parking spot in front of apartment 22, and there were cars on either side of her.  *See* UMF 7; Doc. 155-2 at 27 (diagram); Doc. 155-4 at 14 (diagram).  She spent several minutes cleaning up her car, then sat in her car looking for a lighter.  UMFs 6, 7.  Officers Madrid and Williamson were wearing tactical vests and dark clothing, or "BDUs" (battle dress uniforms).  *See* Doc. 1 ¶ 7; Doc. 150-4 at 7–14.  Their clothing identified them as police officers.  Docs. 150-4 at 9–14 (photos of Officers Madrid and Williamson in the clothes they were wearing that morning).

Both officers approached, and Officer Williamson attempted to open the locked door of the Toyota FJ Cruiser in which Ms. Torres was sitting.  Doc. 155-2 at 7; *see also* UMF 19.  Ms. Torres saw one person standing at her driver's side window, and another at the front tire of her car, on the driver's side.  *See* UMF 19; Doc. 155-1 at 19 (Ms. Torres's diagram of where individuals were situated).  The officers repeatedly shouted, "Open the door!"  UMF 18; *see also* Doc. 150-8 (Exh. H, 1:12–1:18 (Officer Madrid's audio recording of incident)); Doc. 150-9 (Exh. I, 1:01–1:12 (Officer Williamson's audio recording of incident)).  Ms. Torres claimed she could not hear them because her windows were rolled up.  UMF 18.  The officers never orally identified themselves as police officers.  *See* Doc. 150-8 (Exh. H, 1:12–1:18); Doc. 150-9 (Exh. I, 1:01–1:12).  Ms. Torres testified that she thought she was the victim of an attempted

carjacking, so she drove forward. Doc. 155-1 at 13–15. Both officers testified that they believed Ms. Torres was going to hit them with her car, and that they feared for their lives. Doc. 150-2 at 7; Doc. 150-4 at 5.

Both officers fired their duty weapons at Ms. Torres. Doc. 1 ¶ 10; UMF 22 ("Officer Madrid shot at the driver of the vehicle . . . ."); UMF 26 ("Officer Williamson fired his weapon trying to stop the action of Plaintiff's vehicle . . . ."). Another officer on scene, Officer Jeff Smith, testified that "some" of the shots fired were fired after Ms. Torres's vehicle passed Officers Madrid and Williamson, and that once the vehicle had passed them, the officers were not in any danger of being hit. Doc. 155-4 at 9. Ms. Torres continued to drive forward and did not stop. *See* UMF 28. The time from when Officers Madrid and Williamson attempted to open Ms. Torres's door until Ms. Torres drove away and was shot was about twenty seconds. *See* Doc. 150-8 (Exh. H, 1:12–1:30 (Officer Madrid's audio recording of incident)); Doc. 150-9 (Exh. I, 1:01–1:22 (Officer Williamson's audio recording of incident)).

Ms. Torres drove forward, over a curb and landscaping, and left the area. *See* UMFs 28, 30. She drove to a commercial area, lost control of her car, and stole a different car that had been left running in a parking lot. UMF 30. She then drove to Grants, New Mexico. UMF 31. There, she went to the hospital for treatment, Doc. 150-1 at 14, and she subsequently was transferred to the University of New Mexico Hospital (UNMH), *see* Doc. 155-6 (UNMH medical records). She stayed in the hospital one day. UMF 33. Ms. Torres had been shot twice in the back.[2] Doc. 155-6 at 3, 5 (medical record); Docs. 155-7, 155-8 (photos of injuries).

---

[2] Ms. Torres asserts she was shot twice, AMF R, Doc. 155 at 8 ("Despite being shot twice in the back and partially paralyzed, Ms. Torres escaped the apartment complex."), which the officers do not dispute, *see* Doc. 159 at 1, 3 (responding to plaintiff's AMF R). According to the Tenth Circuit, however, "an expert retained by Ms. Torres testified that although there was some initial confusion on whether Ms. Torres's second wound was the entry point of a second bullet or the

3

On July 16, 2014, Ms. Torres was charged by criminal complaint with two counts of aggravated assault with a deadly weapon upon a peace officer, and one count of the unlawful taking of a motor vehicle.  Doc. 150-5.  She was indicted on these charges two weeks later, on July 30, 2014.  Doc. 150-6.  Count 1 of the indictment identified Officer Williamson as the victim, and count 2 of the indictment identified Officer Madrid as the victim.  *Id.* at 1.  On March 31, 2015, Ms. Torres pled no contest to aggravated fleeing from a law enforcement officer, in violation of N.M. STAT. ANN. § 30-22-1.1, a lesser included offense of count 1 of the indictment.  Doc. 150-7 at 1.  She also pled no contest to assault upon a peace officer, in violation of N.M. STAT. ANN. § 30-22-21, a lesser included offense of count 2 of the indictment.  *Id*.  In addition, she pled no contest to count 3 of the indictment, which was the unlawful taking of a vehicle charge.  *Id.*

## II.     The Complaint

In counts I and III of her complaint, Ms. Torres alleges that Officer Madrid and Officer Williamson, respectively, through the intentional discharge of their weapons, "exceeded the degree of force which a reasonable, prudent law enforcement officer would have applied under these same circumstances."  Doc. 1 ¶¶ 14, 21.  In counts II and IV,[3] Ms. Torres alleges that Officers Madrid and Williamson conspired together to use excessive force against her.  *Id.* ¶¶ 17, 24.  In other words, all of Ms. Torres's claims are excessive force claims under the Fourth Amendment.

---

exit path of the first, Ms. Torres was shot only once."  *Torres v. Madrid*, 60 F.4th 596, 599 n.1 (10th Cir. 2023).  Because the evidence of a single shot has not been presented in conjunction with this motion, I will accept Ms. Torres's uncontroverted evidence that she was shot twice, but should this case proceed to trial, this issue will need to be clarified.

[3] The complaint mistakenly identifies count IV as count II.  Doc. 1 at 5.

4

**III.     Discussion**

Officers Madrid and Williamson argue that they are entitled to qualified immunity because no clearly established law squarely governed the particular facts of Ms. Torres's excessive force claims. Doc. 150 at 7–19. They also argue that they are entitled to qualified immunity because their use of force was reasonable. *Id.* at 19–23. They further argue that their actions did not create the need to use lethal force, and that their use of force was reasonable as a matter of law in light of Ms. Torres's convictions for aggravated fleeing and assault on a peace officer. *Id.* at 23–27.

In response, Ms. Torres first argues that aspects of defendants' argument are precluded by the Tenth Circuit's decision in the previous appeal. Doc. 155 at 9–10.[4] Specifically, she argues that the Tenth Circuit's prior opinion precludes defendants from relying on the uncertainty as to whether Ms. Torres was "seized" within the meaning of the Fourth Amendment when the officers shot at her to support their argument that the law was not clearly established. *Id.* at 9. Ms. Torres also argues that the Tenth Circuit held that the *Heck*[5] doctrine does not preclude her excessive force claim because her claim relies on the shots that were fired at Ms. Torres's back, after she no longer posed a threat to defendants. *See id.* at 9–10. She further argues that the officers' use of force after she had passed by them was objectively unreasonable, and that the officers therefore are not entitled to qualified immunity. *See id.* at 10–18. In addition, she argues that the officers' recklessness in creating the dangerous situation further establishes the unreasonableness of their conduct, and that the constitutional violation was

---

[4] Citations to the page numbers in Ms. Torres's response are to the CM/ECF page number at the upper right-hand corner of each page, not the page number at the bottom of each page.

[5] *Heck v. Humphrey*, 512 U.S. 477 (1994).

5

clearly established in July 2014 when this incident took place. *See id.* at 18–25. Because I agree that shooting at a fleeing subject's back when that subject no longer poses a threat to the officers is a constitutional violation that was clearly established in 2014, I deny defendants' second renewed motion for summary judgment based on qualified immunity.

### A. Legal Standard for Summary Judgment Motions

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant bears the initial burden of establishing that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). "[T]he movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). If this burden is met, the non-movant must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Celotex*, 477 U.S. at 324. The non-moving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988). Rather, the non-movant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order

to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (alteration in original) (internal quotation marks omitted).

At the summary judgment stage, the Court must view the facts and draw all reasonable inferences in the light most favorable to the non-movant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court's function "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* Summary judgment may be granted where "the evidence is merely colorable, or is not significantly probative." *Id.* at 249–50 (internal citations omitted).

### B.  Section 1983 Claims and Qualified Immunity

Section 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. To establish a claim under § 1983, a plaintiff must prove that a defendant acted under color of state law to deprive the plaintiff of a right, privilege, or immunity secured by the Constitution or the laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988).

Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would be aware. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Under the Tenth Circuit's two-part test for evaluating qualified immunity, the plaintiff must show (1) that the defendant's conduct violated a constitutional or statutory

right, and (2) that the law governing the conduct was clearly established when the alleged violation occurred. *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998); *accord Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Unless both prongs are satisfied, the defendant will not be required to "engage in expensive and time[-]consuming preparation to defend the suit on its merits." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).

To prove an excessive force claim under the Fourth Amendment, Ms. Torres must prove that the force used to effect a seizure was objectively unreasonable under the totality of the circumstances. *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008). The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). An officer may use deadly force if a reasonable officer under similar circumstances would have had probable cause to believe that there was a threat of serious physical harm to the officer or someone else. *Id.* at 1260.

### C. The Effect of the Tenth Circuit's Prior Opinion in this Case

As an initial matter, defendants make two arguments in their second renewed motion that are foreclosed by the Tenth Circuit's decision in this case. First, they argue that because the law on what constitutes a seizure was not clear in July 2014, defendants are entitled to qualified immunity. *See* Doc. 150 at 9 ("As the law on this element of the claim [—i.e., whether there was a seizure—] was not clearly established in July 2014, Defendants are entitled to immunity."); *id.* at 15 ("Plaintiff . . . cannot show any case law . . . that it was clearly established in July of 2014

8

that she was 'seized.'"). Ms. Torres correctly contends that the Tenth Circuit has rejected this argument. Doc. 155 at 9. As the parties well know, in July 2014, there was a Circuit split as to whether a person was seized within the meaning of the Fourth Amendment if the person did not stop in response to a police officer's physical force or show of authority. *See Torres v. Madrid*, 592 U.S. 306, 310–11 (2021) (Tenth Circuit precedent provided that physical force must terminate the subject's movement to constitute a seizure; question before the Supreme Court was "whether the application of physical force is a seizure if the force, despite hitting its target, fails to stop the person."); *see also id.* at 328 (Gorsuch, J., dissenting) (Dueling passages in *California v. Hodari D.*, 499 U.S. 621 (1991), led to a circuit split; some courts held that a mere touch constituted a Fourth Amendment seizure while others adhered to the view that a "seizure" required "taking possession."). The Supreme Court held "that the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued." *Id.* at 325. Specifically, the Court held that because "the officers' shooting applied physical force to [Ms. Torres'] body and objectively manifested an intent to restrain her from driving away," "the officers seized [Ms.] Torres for the instant that the bullets struck her." *Id.* at 318.

On remand, I held that because the contours of what constituted a seizure were not clear in July 2014, the officers were entitled to qualified immunity. *See* Doc. 131 at 8–9. The Tenth Circuit reversed. The Tenth Circuit held that the qualified immunity analysis could not consider facts that the officers did not know when they were shooting at Ms. Torres and at the moment she was shot. *Torres v. Madrid*, 60 F.4th 596, 603 (10th Cir. 2023). At that moment, all the officers knew was that they were shooting at her with the intent to stop her. Had she stopped as they undoubtedly expected her to do, there is no question that the event would have constituted a

seizure even under Tenth Circuit law in 2014. *See Brooks v. Gaenzle*, 614 F.3d 1213, 1223 (10th Cir. 2010) (The intentional application of physical force must terminate a suspect's movement to constitute a seizure under the Fourth Amendment.), *abrogated by Torres*, 592 U.S. at 325. Thus, the fact that the precise contours of what constituted a seizure in 2014 were not clearly established until the Supreme Court's 2021 decision in this case is irrelevant to the question of whether the officers are entitled to qualified immunity. *Torres*, 60 F.4th at 603. Defendants' argument to the contrary is without merit.

Second, defendants argue that their use of force was reasonable as a matter of law under the *Heck* doctrine because the fifteen shots fired at Ms. Torres were part of a single six to seven-second event, "not a series of separate micro-events." Doc. 150 at 26. The Tenth Circuit held, however, that although the shots were fired over seven seconds, a jury may parse those shots into those "justified by the threat posed by Ms. Torres's vehicle and those . . . not so justified." *Torres*, 60 F.4th at 602; *see also id.* at 599 ("Defendants fired their 15 shots over seven seconds."). The Tenth Circuit flatly held, "Defendants lack a *Heck* defense to Ms. Torres's claims that they employed excessive force after the vehicle had passed the officers." *Id.* at 602. This Court obviously is bound by the Tenth Circuit's decision, and I will not revisit *Heck* in determining whether Ms. Torres's case may proceed.

### D. The Officers are not Entitled to Qualified Immunity.

1. *A reasonable jury could find that the officers shot at Ms. Torres after she no longer posed a threat, which is objectively unreasonable.*

The parties agree that the Court must evaluate the police officers' use of force in this case under the objective reasonableness test set forth in *Graham v. Connor*, 490 U.S. 386, 396–97 (1994). *See* Doc. 150 at 19–23; Doc. 155 at 10–13. In determining what is reasonable, the Court must consider "the facts and circumstances of each particular case, including the severity of the

10

crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Importantly, the Court must judge the reasonableness of the force used "from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight." *Id.* In determining what is reasonable, the Court must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

The second *Graham* factor, the suspect's threat to the safety of officers and others, is the most important factor, particularly in cases involving deadly force because deadly force is only justified if a reasonable officer in the officer's position would have probable cause to believe that the suspect posed a serious threat of physical harm to either the officer or someone else. *Reavis ex rel. Estate of Coale v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020). In assessing the degree of threat posed by the suspect, the Court may consider additional factors, including "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen*, 511 F.3d at 1260. Whether the officers' use of force was objectively reasonable "depends both on whether the officers were in danger at the precise moment that they used force and on whether [their] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Reavis*, 967 F.4th at 985 (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)). An officer's use of deadly force to prevent the escape of a felony suspect who does not pose an immediate threat to the officer or

others is objectively unreasonable and unconstitutional. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

In this case, the officers approached Ms. Torres in conjunction with their efforts to execute an arrest warrant on an African American woman who they believed lived in apartment 22. Ms. Torres, who is Navajo, Doc. 155-1 at 7, was parked in front of apartment 22 at about 6:30 in the morning. The officers appeared not to know whether Ms. Torres had any connection to apartment 22: it was not quite light out; it was drizzling, and Ms. Torres's windows were tinted so that the officers could not clearly see inside her car. Doc. 150-1 at 5; Doc. 150-2 at 5; Doc. 150-8 (Exh. H at 16:55–17:07). Rather than announce their presence, the officers quietly approached Ms. Torres's car and attempted to open the door, which was locked. Doc. 150-8 (Exh. H, 00:42–01:26); *see also* Doc. 150-1 at 6. Ms. Torres—who claimed she was startled and thought she was being carjacked—drove forward, initially endangering the officers, but then driving away from them. As the officers were attempting to open Ms. Torres's car door, they shouted, "Open the door!" Ms. Torres claimed she could not hear them, and she did not open her door.

The only "weapon" in Ms. Torres's possession was her vehicle; there is no evidence that Ms. Torres had any other weapon. Although the officers testified that Ms. Torres was moving around in the front seat of her car and they did not know whether she had a weapon, they nonetheless approached her, and they never ordered her to drop a weapon or show her hands,[6] which supports the inference that they did not believe she had a weapon inside her car when they

---

[6] Although Officer Williamson testified that he told Ms. Torres to show her hands, Doc. 150-4 at 3, that command is not audible on either his or Officer Madrid's audiotape, *see* Docs. 150-8; 150-9. He later testified that he had no reason to believe that Ms. Torres had a weapon inside her vehicle. Doc. 155-2 at 13.

12

approached her. Thus, the only hostile motion that Ms. Torres made with a "weapon" was driving toward the officers, but then she drove away from them. As the distance between her and the officers increased, the threat to the officers decreased. Notably, the initial distance between the officers and Ms. Torres was entirely a result of the officers' own actions;[7] Ms. Torres was parked and not moving until the officers attempted to open her car door. At that point, the manifest intention of Ms. Torres initially appeared to be that she might harm one or both of the officers, but then it became clear that she was driving away.

  Here, although the officers initially may have shot at Ms. Torres to protect themselves or each other, substantial evidence supports the view that the shots fired at the rear of the vehicle were fired after the danger to the officers had passed. Officer Jeff Smith, who was at the scene, testified that some of the shots fired were fired after Ms. Torres's vehicle had passed Officers Madrid and Williamson and they were no longer in danger. Doc. 155-4 at 9. Officer Madrid testified that Officer Williamson fired at least one shot at the back of Ms. Torres's vehicle, after Officer Madrid was out of danger. Doc. 155-3 at 13. Officer Williamson testified that he shot at Ms. Torres as she was leaving. Doc. 155-2 at 12. At least three shots were fired at the rear of the vehicle, *see* Doc. 155-13 at 2–3, 18–22, and Ms. Torres was shot in the back, *see* Doc. 155-6 at 3; Docs. 155-7, 155-8. Indeed, Ms. Torres's "claim focuses on the shots Defendants fired in the side and back of her car after any danger had passed—including the two that struck her back." Doc. 155 at 10. Thus, although defendants argue that only six to seven seconds elapsed from the first shot to the last, and that once "the Officers perceived the threat to have passed, they ceased firing," Doc. 150 at 23, the Tenth Circuit already has held that a jury is capable of

---

[7] An expert retained by Ms. Torres testified that it violated police procedure for Officer Madrid to stand in front of Ms. Torres's car and was potentially reckless. *See* Doc. 155-5 at 8, 11.

"pars[ing] Defendants' shots into those uses justified by the threat posed by Ms. Torres's vehicle and those uses not so justified," *Torres*, 60 F.4th at 602; *see also Estate of Smart ex rel. Smart v. City of Wichita*, 951 F.3d 1161, 1177 (10th Cir. 2020) (whether final shots fired over five seconds were fired after suspect no longer posed a threat was a jury question); *Francher v. Barrientos*, 723 F.3d 1191, 1199–1200 (10th Cir. 2013) (Tenth Circuit did not have jurisdiction to review district court's determination that reasonable jury could find that the six shots fired after the first shot—when subject was no longer a threat to the officer or others—constituted excessive force.). Because a reasonable jury could find that the officers shot at Ms. Torres after she no longer posed a threat, the second *Graham* factor weighs against the officers.

The first and third *Graham* factors are less important, and they essentially cancel each other out. The first *Graham* factor—the severity of the crime being investigated—weighs against a finding that the officers' use of deadly force was objectively reasonable. The officers were at the apartment complex to execute an arrest warrant on an African American female who had been charged with white collar felony crimes. The officers did not know whether Ms. Torres had any relation to the female they were there to arrest; she simply was parked in front of the apartment where they believed the subject lived. The officers were not investigating a violent crime. Although there is some evidence that associates of the woman they were there to arrest were involved in violent activity, the officers had no specific information that Ms. Torres was involved in that activity in any way. The officers simply wanted to identify Ms. Torres; they did not have probable cause to believe that she had engaged in any criminal activity.

The third *Graham* factor—whether the suspect is resisting or attempting to evade arrest—weighs in favor of a finding that the officers' use of deadly force was objectively reasonable. The evidence is conflicting, however, as to whether Ms. Torres was attempting to evade arrest—

14

there is no question that the officers were not there to arrest her—, or whether she was avoiding what she thought was a carjacking. Thus, although it is clear that Ms. Torres fled, it is not obvious that she did so to resist or evade arrest. This factor therefore weighs slightly in favor of finding that the officers' use of deadly force was objectively reasonable, but it is not enough to tip the balance in the officers' favor.

Because there is sufficient evidence for a reasonable jury to find that the officers shot at Ms. Torres after she no longer posed a threat to them or anyone else, summary judgment is not appropriate, and the officers are not entitled to qualified immunity.

> 2. *Case law in existence in July 2014 made clear that officers could not use deadly force to stop a fleeing suspect who does not pose a threat to the officers or others.*[8]

Ms. Torres points to two Tenth Circuit cases to support her position that the law was clearly established in July 2014 that the officers could not use deadly force against her once she no longer posed a threat to them. She relies on *Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009) and *Reavis ex rel. Estate of Coale v. Frost*, 967 F.3d 978 (10th Cir. 2020). The officers counter that multiple cases make clear that officers may employ deadly force to protect themselves or others, including when a subject drives a vehicle toward another person. *See* Doc. 150 at 21. Although the officers are correct that they may use deadly force to protect themselves from a vehicle that threatens to run them over, it was clearly established in July 2014 that once the vehicle no longer poses a threat to them or anyone else, deadly force may not be used.

---

[8] In their motion, the officers assert—without citation to any authority—that because "the Supreme Court relied upon common law in determining what constituted a seizure, a similar analysis should be used in determining what was clearly established law." Doc. 150 at 9. They further suggest that rather than relying on the objective unreasonableness standard set forth by the Supreme Court in *Graham*, the Court should refer to the common law around 1791 to determine what is unreasonable. *Id.* at 10. The Court will not engage in this exercise absent clear and binding authority that requires it to do so, which it has not found.

Because *Cordova* was decided in 2009, five years before the events in this case, it is most apt. In that case, Toby Cordova was driving a truck pulling a heavy piece of equipment in a place and at a time that an officer thought suspicious. *Cordova*, 569 F.3d at 1186. Officers attempted to stop Mr. Cordova, and an officer eventually shot and killed him as he recklessly fled from the police during a dangerous car chase. *Id.* at 1185–86. Mr. Cordova's survivors brought suit under 42 U.S.C. § 1983, alleging that the officer who shot Mr. Cordova used excessive force to end the police chase. *Id.* The district court granted summary judgment in favor of the officer, holding that the evidence, even when viewed in the light most favorable to the plaintiffs, did not support a finding that the officer used excessive force. *Id.* at 1185–86.

The Tenth Circuit held otherwise. During the chase, two officers riding together stopped their vehicle, got out, and positioned themselves to try to force Mr. Cordova to drive in a certain direction. *Id.* at 1186–87. According to the officers, Mr. Cordova kept driving and drove his truck toward one of the officers. *Id.* The officer claimed that he was in immediate danger, so he drew his gun and rapidly fired four or five shots, one of which hit Mr. Cordova in the back of the head and killed him. *Id.* at 1187. Several pieces of evidence, however, suggested that the officer was not in immediate danger when he fired the fatal shot: only one bullet hit the front of the truck while the others—including the fatal shot—hit the side of the truck, suggesting that Mr. Cordova had turned away from the officer when the fatal shot was fired. *Id.* Also, the plaintiffs claimed that the officer easily could have avoided any danger by remaining behind his patrol car, and they also claimed that the officer created the danger by employing a questionable maneuver in trying to stop the truck. *Id.* Because of these disputed facts, the Tenth Circuit held that the officer had not established as a matter of law that shooting all five shots at the subject, including the final fatal shot, was objectively reasonable. *Id.* at 1192.

16

The court in *Cordova* nonetheless held that the officer was entitled to qualified immunity because the law was not clearly established. *See id.* at 1192–93. Although the court remarked that "[t]here is no question that the general principle governing the use of force is clearly established: deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself [or herself] or others." *Id.* at 1192. What was not clearly established was "how high the risk of harm to third parties must be before an officer can use a level of force nearly certain to cause death." *Id.* at 1195. The court held that the threat to the officer or others had to be "immediate" to warrant the use of deadly force. *See id.*

In this case, the officers make no argument that they were concerned about the risk of harm to anyone but themselves.[9] Thus, *Cordova* clearly established in 2009 that Officers Madrid and Williamson could only use deadly force against Ms. Torres if they had probable cause to believe she posed an immediate threat of serious physical harm to themselves or others. Indeed, the Tenth Circuit has since held that *Cordova* provided fair notice to "every officer" that "opening fire at a fleeing vehicle that no longer posed a threat to himself or others was unlawful." *Reavis*, 967 F.3d at 995. Because there are sufficient facts in this case for a reasonable jury to find that the officers continued to use deadly force after the threat to them had passed, the officers are not entitled to summary judgment based on qualified immunity.

None of the cases cited by the officers change this result. As the Tenth Circuit held, and as Ms. Torres has reiterated, Ms. Torres does not contend that Officers Madrid and Williamson

---

[9] Even if the officers had asserted that they were concerned that Ms. Torres was driving recklessly and might endanger others in the vicinity, *Cordova* forecloses that argument. "When an officer employs such a level of force that death is nearly certain, he [or she] must do so based on more than the general dangers posed by reckless driving." *Cordova*, 569 F.3d at 1190.

were not entitled to protect themselves when Ms. Torres drove toward them.  *See Torres*, 60 F.4th at 601; Doc. 155 at 13–14.  The cases cited by the officers reaffirm that officers may use deadly force to protect themselves or others from a moving vehicle.  *See, e.g.*, *Carabajal v. City of Cheyenne, Wyo.*, 847 F.3d 1203, 1209–10 (10th Cir. 2017) (officer was entitled to qualified immunity when a subject failed to comply with police commands and appeared to deliberately drive toward a police officer in close quarters); *Thomas v. Durastanti*, 607 F.3d 655, 666 (10th Cir. 2010) (Because plaintiff believed he was wounded in the first volley of shots, and at that precise moment it was reasonable for the law enforcement agent to believe he was in danger of being hit by the car in which the plaintiff was riding, the agent's use of deadly force was objectively reasonable; all additional shots were fired after the agent was hit by the moving vehicle and because that experience necessarily would have been disorienting, any mistake was reasonable.).  But the Tenth Circuit also has clearly established that just because an officer initially may be justified in shooting at a subject, that officer cannot continue to fire shots once the danger has passed.  *See Cordova*, 569 F.3d at 1187; *Fancher*, 723 F.3d at 1199–1200.  Because the relevant law was clearly established before the events in this case took place, Officers Madrid and Williamson are not entitled to qualified immunity.

### IV.     Conclusion

Officers Madrid and Williamson are not entitled to qualified immunity because a reasonable jury could find that they continued to shoot at Ms. Torres after she drove past them and no longer posed an immediate threat to them or anyone else.  Further, the law that the officers were not permitted to use deadly force to stop Ms. Torres once she no longer posed an immediate threat to them or anyone else was clearly established in July 2014, when the events

18

occurred.  The Court therefore DENIES defendants' Second Renewed Motion for Summary Judgment on the Basis of Qualified Immunity and Other Grounds (Doc. 112).

    IT IS SO ORDERED.

                                                            _____
                                                            Laura Fashing
                                                            United States Magistrate Judge
                                                            Presiding by Consent